UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | |
|---|---|
| In re | |
| COLORADO CUSTOMWARE, INC. | Bankruptcy Case No. 13−22227−EEB |
| Debtor. | Chapter 11 |

**DEBTOR'S MOTION TO: (A) SELL SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTEREST PURSUANT TO 11 U.S.C. § 363(f); (B) ASSUME AND ASSIGN EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365; AND (C) APPROVE BIDDING PROCEDURES**

Colorado Customware, Inc. ("the Debtor"), for its Motion to: (A) Sell Substantially All Assets Free and Clear of Liens, Claims and Interests Pursuant to 11 U.S.C. § 363(f); (B) Assume and Assign Executory Contracts Pursuant to 11 U.S.C. § 365; and (C) Approve Bidding Procedures (this "Sale Motion") states:

### BACKGROUND

1. On July 17, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11, U.S.C. (the "Bankruptcy Code").

2. The Debtor is engaged in the business of the development, marketing and distribution of mass appraisal and tax collection software solutions (the "Business").

3. The Debtor continues to operate Debtor's business and manage its property pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

4. No official creditors' committee, trustee, or examiner has been appointed in Debtor's case.

5.	Through this Sale Motion, the Debtor seeks authority to sell substantially all of its assets to N. Harris Computer Corp., an Ontario corp., and Harris Systems USA, Inc., a Delaware corporation (collectively, the "Purchasers")[1].

6.	The Purchasers have proposed a purchase price of $3,250,000 cash, subject to holdbacks and purchase price adjustments, for the assets to be sold (the "Acquired Assets"). The Asset Purchase Agreement between the Debtor and Purchaser ("APA") is attached hereto as **Exhibit A**, and summarized below.

7.	The Debtor also requests approval proposed bidding procedures with deadlines and requirements for any competing bids, and bid protections for the Purchasers.

## SUMMARY OF SALE TERMS

8.	The APA sets forth the terms of the proposed sale. It is the result of arms length, good faith negotiations between Alliance and the Purchasers. The following summarizes key terms of the APA.[2]

9.	<u>Acquired Assets</u>. The Debtor proposes to sell software and other assets to Purchasers:

*Software*

The computer programs known by the names as set out in <u>Schedule C</u> to the APA, including all versions thereof, and all related documentation, manuals, source code and object code, program files, data files, computer related data, field and data definitions and relationships, data definition specifications, data models, program and system logic, interfaces, program modules, routines, sub-routines, algorithms, program architecture, design concepts, system designs, program structure, sequence and organization, screen displays and report layouts, and all other material related to the said computer programs, all as they exist at the Time of Closing, whether under development or as currently being marketed by the Seller (the "Software").[3]

---

[1] For convenience, the Motion will refer to the Purchasers in the collective. This is not intended to supersede the terms of the Asset Purchase Agreement dealing with each of the Purchasers individually.
[2] This summary is qualified in its entirety by reference to the APA. In the event of a conflict, the APA shall govern.
[3] Capitalized terms not defined in this Motion are as defined in the APA.

*Other Assets*

    (a)    all intellectual property rights worldwide in and to the Software, including, but not limited to, the exclusive world-wide right to develop, modify, market, sell, distribute and install the current and future releases of the Software; and

    (b)    all of the intellectual property owned by the Seller and all rights of the Seller therein and thereto, worldwide, whether registered or unregistered (collectively with the Software, the "**Intellectual Property**"), including without limitation, the exclusive worldwide rights to develop, modify, market, sell, distribute and install all current and future releases of the Software and its products and:

        (i)    **Copyrights** – all copyrights owned by the Seller, including without limitation, all copyrights in and to the computer software programs listed in Schedule C, including the Software and all applications and registrations of such copyrights;

        (ii)    **Trademarks; Domain Names** - all trademarks, tradenames, service marks, brand names, logos, domain names or the like owned by the Seller, whether used in association with wares or services, including without limitation, those trademarks listed in Schedule C and all applications, registrations, renewals, modifications and extensions of such trade-marks and domain names;

        (iii)    **Patents** – all patents, patent applications and other patent rights, if any, of the Seller;

        (iv)    **Technology** – all technology created, developed or acquired by the Seller whether or not patented or patentable, including without limitation, all inventions, know how, techniques, processes, procedures, methods, trade secrets, research and technical data, records, formulae, designs, industrial designs, sketches, patterns, databases, specifications, schematics, blue prints, flow charts or sheets, equipment and parts lists and descriptions, samples, reports, studies, findings, algorithms, instructions, guides, manuals, and plans for new or revised products and/or services; and

        (v)    **Licenses** - all licenses, sub-licenses and franchises listed in Schedule C in which the Seller is a licensee or a licensor of intellectual property of a nature described in paragraphs (i) - (iv).

    (c)    All computer and other equipment and accessories and supplies of all kinds owned by the Seller whether located in or on the premises of the Seller or elsewhere including, without limitation, those items listed in Schedule B to the APA;

    (d)    All right, title and interest of the Seller in, to and under the Assumed Contracts including the full benefit of all unfilled orders received by the Seller;

3

(e) All work in process relating to the Assets;

(f) All prepaid expenses and deposits relating to the Assets;

(g) All inventory listed on Schedule F to the APA;

(h) All loans and advances made by the Seller to suppliers of the Seller relating to the Business;

(i) The full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and the like and all security therefor received by the Seller on the purchase or other acquisition of any part of the Assets;

(j) All books, records or files of the Seller including, without limitation all financial, production, personnel, sales and customer records;

(k) All cash, term or time deposits owned or held by or for the account of the Seller;

(l) All accounts receivable (net of any required allowance for doubtful accounts), trade accounts, notes receivable, book debts and other debts due or accruing due to the Seller, all of which are listed in Schedule J to the APA;

(m) All claims, choses in action, causes of action and judgments relating to the Assets;

(n) All certifications, franchises, approvals, permits, licenses, orders, registrations, certificates, and other similar rights obtained from any governmental authority or professional or trade organization and all pending applications therefor;

(o) All rights of the Seller in and to customer and supplier lists and all rights to the telephone and facsimile numbers set forth thereon;

(p) All rights to insurance policies covering the alleged or actual damage, destruction or impairment of the Assets (including, but not limited to, bodily injury) or other rights described, which damage, destruction or impairment occurred on or prior to the Closing Date;

(q) That portion of the Seller's goodwill related to the Software;

(r) All rights of the Seller under any non-compete agreements;

(s) All rights of the Seller in and to the Leased Premises; and

(t) All other rights of the Seller related to the Business and the Assets (other than any Excluded Assets).

10. <u>Excluded Assets</u>.  The Debtor will retain the following assets:

(a) Life insurance proceeds receivable in respect of the life of any Principal;

(b) Income taxes refundable and all refundable sales taxes, excise taxes, municipal taxes and like taxes and interest thereon refundable to the Seller in respect of any period ending prior to the Closing Date (including all records related to Taxes paid or payable by the Seller relating to the Business or the Assets);

(c) All notes receivable, or other debts due or accruing due to the Seller from any Principal;

(d) All books and records relating to the Excluded Assets and the corporate charter, taxpayer and other identification numbers, seals, minute books, unit transfer records and other documents related to the organization, maintenance and existence of the Seller as a legal entity;

(e) All of the Seller's rights under this Agreement (including any amounts due and owing to the Seller under this Agreement);

(f) All rights, duties and obligations of the Seller relating to any and all employment and consulting agreements of any nature (other than any Employment Agreements in the form of Schedule K to be entered into in connection with this Agreement as set forth on Schedule G);

(g) All insurance policies owned and maintained by the Seller and all rights thereunder other than those specifically referenced in Section 2.2 hereof;

(h) All claims of the Seller against third parties related to the Excluded Assets, whether choate or inchoate, known or unknown, contingent or non-contingent;

(i) All Contracts that are not Assumed Contracts, including all rights arising thereunder;

(j) Any records, documents or agreements relating to the Seller's chapter 11 proceedings in the Bankruptcy Court;

(k) Any confidential personnel and medical records pertaining to the Seller's employees;

(l) All records of the Seller that are required to be retained pursuant to applicable law; and

(m) All insurance policies and binders and all claims, refunds and credits from insurance policies or binders due to or to become due with respect to such policies or binders to the extent such claims, refunds or credits relate to an incident or occurrence relating to the Assets or the Business prior to the Closing.

016844\0001\10694815.1

11.     Purchase Price.  The Purchase Price in the aggregate amount of $3,250,000 will be payable by the Purchasers to the Seller by wire transfer of immediately available funds as follows:

(a)     $2,750,000 less (i) the Actual Vendor Contract Cure Amount that will be paid at the Time of Closing and (ii) any adjustment determined in accordance with the terms of Section 2.6(b) of the APA; and

(b)     A $500,000 Holdback Amount will be held by Harris Ontario, and subject to the terms of this Agreement, paid on the first Business Day after the TNA Holdback Release Date (as defined in the APA).  The Holdback Amount is subject to (i) the adjustment determined in accordance with the terms of Section 2.6(e) of the APA (ii) the adjustment determined in accordance with the terms of Section 2.11 of the APA, and (iii) the limitations set forth in Section 2.6(h) of the APA.

12.     The APA contemplates that Purchasers and Lori Burge, the Debtor's principal, will enter into a Transition Services Agreement, at the request of Purchasers.  The agreement contemplates services rendered personally by Ms. Burge and compensation paid personally to Ms. Burge.  Although Ms. Burge will be willing to enter into similar agreements with the Purchasers, it is not a requirement of any competing bid that any arrangement with Ms. Burge be reached.

13.     Closing Conditions and Deliveries.  The APA conditions Purchasers' obligation to purchase upon satisfaction of conditions and deliveries out a number of items described in Section 5.1 of the APA.  In addition, Purchasers may terminate if contract cures exceed estimates and negative adjustments to the balance sheet due to contract values exceed certain thresholds.

## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

14. To facilitate and effect the sale of the Acquired Assets, Debtor seeks to assume and assign to Purchaser the Assigned Contracts and Assigned Leases listed on Schedule L to the APA (together, the "Assumed Contracts"). Section 365 of the Bankruptcy Code authorizes the Debtor to assume and/or assign the Assumed Contracts subject to the approval of the Bankruptcy Court.

15. Assumption and assignment of the Assumed Contracts represents an exercise of the Debtor's sound business judgment. Moreover, the Debtor is able to satisfy the requirements of Sections 365(b) and (f) of the Bankruptcy Code because to the extent that a non-debtor party to an Assumed Contract does not consent to its assignment, the Debtor will be prepared to demonstrate at the Sale Hearing (or thereafter, as appropriate), that the requirement of adequate assurances of future performance by the Purchaser will be satisfied.

## BID PROCEDURES

16. By its terms, the transaction provided in the APA is subject to higher and better bids. The Debtor, in cooperation with its primary lender, is actively seeking other bids. An electronic data room has been established, a form non-disclosure agreement has been prepared and potential other purchasers have been contacted in the process of disseminating information is under way. To ensure that the process of listing other bids is orderly and fair, the Debtor has proposed formal Bid Procedures and has negotiated them with the Purchasers. A copy of the proposed order approving the Bid Procedures (with Bid Procedures attached) is attached as **Exhibit B**. In summary, the process provides that potential bidders will be financially qualified and will execute a non-disclosure agreement. After a certain amount of information and discussion, they will be asked to submit preliminary non-binding bids demonstrating a level of interest. After further diligence and information exchanged, buyers/purchasers will be required

7

to submit binding bids coupled with an earnest money deposit. If there are any qualified bids other than the Purchasers, there will be an auction and the winner of the auction will be substituted as the Purchaser for approval at hearing on this Motion.

17. The Debtor had negotiated with the Purchasers to allow a fulsome process with a closing in December, 2013. Since negotiation of the APA, however, the Debtor has determined that it needs to proceed more quickly. First, the Debtor is projecting running out of cash, and while its secured lender is conditionally willing to provide a small debtor-in-possession loan, it is not sufficient to carry the company through the end of the year. Second, the Debtor is at risk of losing key employees, has lost one, and in its judgment believes that it must proceed more quickly than the deadlines negotiated with the Purchasers. Accordingly, the Debtor proposes the following schedule:

(a) Preliminary bids would be due October 4, 2013, (b) Qualified Bids would be due November 7, 2013, (c) auction, if any, would be held November 13, 2013, and (d) the Debtor would request a hearing on the Sale sometime close to November 18, 2013, as the Court's calendar permits. Closing would occur on or about November 25, 2013.

18. Because the process is already under way, the Debtor believes that this will allow bidders sufficient time to obtain information, consider it and put competing bids together within this timeframe, if needed. This also meets a schedule dictated by the Debtor's cash needs.

19. In the APA, the Debtor has also agreed, subject to Court approval, that the Purchasers will receive a breakup fee of $100,000 and reimbursement of actual out-of-pocket expenses up to $62,500. The Debtor's agreement to the breakup fee and expense reimbursement was essential to obtaining the Purchaser's agreement to proceed with the APA.

016844\0001\10694815.1

**ARGUMENT AND AUTHORITY**

<u>Business Judgment</u>.

20. Section 363 of the Bankruptcy Code generally permits the debtor in possession, after notice and a hearing, to sell property of the estate "other than in the ordinary course of business." 11 U.S.C. § 363(b)(1). The proposed sale is free and clear of all liens other than Permitted Liens listed on Schedule 2 to the APA.

21. Approval of a sale of property pursuant to § 363 is warranted where there exists a "sound business reason." *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). "In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'" *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *see In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004) (similar).

22. Factors bearing on whether a sound business reason or purpose supports a proposed sale of estate property include (where applicable):

> (1) the proportionate value of the asset to the estate as a whole;
> (2) the amount of elapsed time since the filing; (3) the likelihood
> that a plan of reorganization will be proposed and confirmed in the
> near future; (4) the effect of the proposed disposition on the future
> plans of reorganization; (5) the proceeds to be obtained from the
> disposition vis-à-vis any appraisals of the property; (6) which of
> the alternatives of use, sale or lease the proposal envisions; and (7)
> most importantly perhaps, whether the asset is increasing or
> decreasing in value.

*In re Medical Software Solutions*, 286 B.R. 431, 441 (Bankr. D. Utah 2002) (quoting *Lionel*, 722 F.2d at 1071) (emphasis omitted).

23. In addition to the exercise of business judgment, courts assess whether there has been "adequate and reasonable notice to interested parties, including full disclosure of the sale

terms" and the relationship of the debtor and/or trustee to the transferee, along with a fair and reasonable price and good faith by the parties. *Medical Software*, 286 B.R. at 440; *see also Castre*, 312 B.R. at 428 (listing as pertinent factors: (a) whether there is improper or bad motive; (b) fair sales price; (c) adequacy of procedures; (d) propriety of any stalking horse bid; (e) preparation and conduct of sale; and (f) the highest and best bid received).

24. "[T]he bankruptcy court has considerable discretion" in evaluating and approving a proposed transfer other than in the ordinary course of business under § 363(b). *Montgomery Ward*, 242 B.R. at 153; *see Moldo v. Clark (In re Clark)*, 266 B.R. 163, 168 (B.A.P. 9th Cir. 2001) (recognizing that "[r]ulings on motions to sell property of the estate other than in the ordinary course of business pursuant to section 363 are reviewed for abuse of discretion").

25. Debtor's business judgment is that the Purchase Price is both fair and reasonable and fairly represents the fair market value obtainable for the Acquired Assets between a willing buyer and a willing seller. The Purchase Price is in excess of the amount the Debtor could reasonably expect to receive in a forced liquidation.

26. The likely alternative to the proposed sale is a forced liquidation for an amount substantially less than the Purchase Price. All terms of the proposed sale have been fully disclosed, and the APA was negotiated at arms length and in good faith. Accordingly, it is Debtor's judgment that the sale of the Acquired Assets to Purchaser is in the best interest of the Debtor, its estate, and its creditors.

Section 363(f).

27. Under Section 363(f), property of the estate may be sold "free and clear of any interest in such property of an entity other than the estate" where, among other things: (a) the interest holder consents, 11 U.S.C. § 363(f)(2); (b) the interest is a lien and the sale price is

greater than the aggregate value of all liens on such property, 11 U.S.C. § 363(f)(3); (c) the "interest is in bona fide dispute," 11 U.S.C. § 363(f)(4); or (d) where the "entity [asserting such interest] could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5).

28. A party's consent for a free and clear transfer under § 363(f)(2) may be implied and an interest holder's failure to object, after due notice and an opportunity, qualifies as consent for purposes of a free and clear transfer. *See, e.g., Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345-46 (E.D. Pa. 1988); *Hargrave v. Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *cf. In re DeCelis*, 349 B.R. 465, 469 (Bankr. E.D. Va. 2006); *see also In re High Country Club, LLC*, Case No. 09-11070 MER (Supplemental Order, docket entry number 115 entered on December 17, 2009), and *In re EagleSpan Steel Structures, LLC*, Case No. 10-23491 MER (docket entry number 101 entered July 13, 2010).

29. The language of 363(f)(3) that requires the sale price to be "greater than the aggregate value of all liens on such property" means that the sale price must be more than the sum of all debts that encumber the property. *In re Jaussi*, 488 B.R. 456, 459 (Bankr. D. Colo. 2013).

30. Parties that may assert a lien in some or all of the Acquired Assets include: (a) Versus Bank, which holds a first security interest in substantially all of the Debtor's assets, securing a debt of approximately $7.6 million; and (b) Vision Appraisals Technologies, junior to Versus Bank, securing obligations of approximately $2.1 million. The sale price will only partially pay Versus Bank. The other secured lien lacks value absent a serious increase in bids.

31. The Debtor also may transfer estate property free and clear of an interest that is in "bona fide dispute," which generally requires "an objective basis for either a factual or legal

dispute" concerning the validity of the interest. *In re Octagon Roofing, L.P.*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1995) (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)). The Court "need not determine the probable outcome of the dispute, but merely whether one exists." *Id.*; *see also Union Planters Bank, N.A. v. Burns (In re Gaylord Grain, LLC)*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004); *see In re Robotic Vision Sys., Inc.*, 322 B.R. 502, 507 (Bankr. D.N.H. 2004) (objective dispute as to validity of interest suffices for free and clear sale under § 363(f)(4)).

32. Alternatively, a transfer free and clear of interests is appropriate under § 363(f) if the interest holder "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of [its] interest." 11 U.S.C. § 363(f)(5). "[I]t is clear that Section 363(f)(5) allows trustees of an estate to sell property free and clear of liens when 'a legal or equitable proceeding' exists that will force the lien holder to accept less than full money satisfaction for [its] interest." *In re Grand Slam U.S.A., Inc.*, 178 B.R. 460, 462 (E.D. Mich. 1995); *see also In re Healthco Int'l, Inc.*, 174 B.R. 174, 176 (Bank. D. Mass. 1994) (discussing why "money satisfaction of such interest" under Section 363(f)(5) "does not mean full payment of the underlying debt").

33. Versus Bank has consented to the proposed sale, and the Debtor believes the other lienholders have consented by agreeing or acquiescing in the sale. Any other purported lienholder that fails to object to the Sale Motion is deemed to have consented. Thus, Section 363(f)(2) is satisfied.

34. Any liens not discussed herein would be disputed by the Debtor, so that Section 363(f)(4) is satisfied.

35. Any putative lienholder that is junior to the first priority liens of the Secured Lender could be compelled in a Uniform Commercial Code foreclosure action, or a state court

receivership, to receive money satisfaction (or face foreclosure of its junior lien position entirely). *See In re Jolan, Inc.*, 403 B.R. 866, 869-70 (Bankr. W.D. Wash. 2009). Therefore, even if other parties assert liens against any of the Acquired Assets, the proposed sale free and clear is appropriate under § 363(f)(5).

36.    The Debtor is serving notice of this Sale Motion on all creditors and interested parties pursuant to the Court's creditor mailing matrix.

## CONCLUSION AND RELIEF REQUESTED

WHEREFORE, for the foregoing reasons the Debtor respectfully requests that the Court grant the relief requested in this Sale Motion and order such other relief as deemed appropriate.

Dated this 20th day of September 2013.

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

*s/Michael J. Pankow*
Michael J. Pankow, #21212
410 17th Street, Suite 2200
Denver, Colorado  80202
Tel:  (303) 223-1100
Fax:  (303) 223-1111
mpankow@bhfs.com

*Attorneys for the Debtor*

## CERTIFICATE OF SERVICE

  The undersigned certifies that on September 20, 2013, I served by prepaid first class mail a copy of the **DEBTOR'S MOTION TO: (A) SELL SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTEREST PURSUANT TO 11 U.S.C. § 363(f); (B) ASSUME AND ASSIGN EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365; AND (C) APPROVE BIDDING PROCEDURES** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED.R. BANKR. P. and the L.B.R. at the following addresses:

Leo M. Weiss
US Trustee's Office
999 18th St., Ste. 1551
Denver, CO 80202

Colorado Customware, Inc.
736 Whalers Way Bldg F100
Fort Collins, CO 80525

Lori Burge
418 Spinnaker Lane
Fort Collins, Colorado 80525

Perkins Coie LLP
Attention: Norton Cutler
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Fax: 303.291.2400

Robert T. Cosgrove
303 E. 17th Ave.
Ste. 800
Denver, CO 80203-1261

Charles A. Dale, III
One Lincoln Street
Boston, MA 02111

Zach Shaw
2001 S. State St., S-3600
Salt Lake City, UT 84190

Gill Geldreich
PO Box 20207
Nashville, TN 37202-0207

Lori L Winkelman
2 North Central Ave
Phoenix, AZ 85004

              */s/Connie Windholz*
              Connie Windholz, Paralegal

016844\0001\10694815.1